## S02A0972. MORRIS v. THE STATE.
(571 SE2d 358)

SEARS, Presiding Justice.

Appellant James Morris appeals his convictions for murder and related crimes,[1] and his resulting life sentence. Having reviewed the

---

[1] The crimes occurred on October 5, 1998. Appellant was indicted on December 11, 1998, for malice and felony murder, aggravated assault, and illegal firearm possession. At trial held on December 5-8, 2000, appellant was found guilty on all counts and sentenced to life in prison for malice murder (with the felony murder and aggravated assault convictions being vacated by operation of law) and a consecutive five-year sentence for illegal firearm possession. The transcript was certified on January 9, 2001. Appellant's new trial motion was filed on December 13, 2000, and denied on January 29, 2002. A notice of appeal was filed on February 26, 2002, the appeal was docketed with this Court on March 18, 2002, and oral arguments were heard on June 10, 2002.

record, we conclude that under the circumstances of this case, appellant's statements to a family friend who had recently become a minister did not fall within the scope of Georgia's statutory privilege attaching to communications made to members of the clergy. Finding no merit to appellant's other claims of error, we affirm.

The evidence of record shows that appellant met his wife as she returned home from work one day and shot her to death. He then took his two daughters to the home of his stepsister, Davis, and told Davis that he had shot and killed his wife. Appellant then telephoned his long-time friend and "father figure," Reverend Donald Boyd, and arranged to meet him in a restaurant parking lot. Appellant told Reverend Boyd that he had killed his wife, and that he wanted to turn himself in. Reverend Boyd then drove appellant to the police station, where appellant confessed to his crimes.

1. The evidence, construed most favorably to the jury's verdicts, was sufficient to enable rational triers of fact to find appellant guilty beyond a reasonable doubt of the crimes for which he was convicted.[2]

2. Because appellant's communications with Reverend Boyd did not fall within Georgia's statutory privilege for certain statements made to members of the clergy, the trial court did not err in denying appellant's motion in limine seeking to exclude all communications with Boyd.

"Every communication made by any person professing religious faith, seeking spiritual comfort, or seeking counseling" to a clergy person shall be deemed privileged.[3] However, if such communications are not made to profess religious faith, or to seek spiritual comfort or guidance, "but [rather are] conversational statements to . . . a friend and frequent companion . . . [t]he ministerial privilege [is] not applicable."[4]

In this matter, the evidence shows that appellant had known Mr. Boyd for many years, having been a childhood friend of Boyd's son. Mr. Boyd and his wife were established parental figures for appellant. It was only two years before appellant's trial, however, that Mr. Boyd became a Baptist minister. Boyd was never appellant's minister. In fact, when appellant telephoned Reverend Boyd on the night of the murder, and Boyd asked appellant why he had called him, appellant replied, "Because you're the only father figure I've ever had." Accordingly, the trial court was authorized to conclude that, on the night of the murder, appellant did not reach out to Reverend Boyd in his capacity as a clergyman, but rather because of his close, familial relationship with Boyd. The mere fact that Boyd had become

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[3] OCGA § 24-9-22.

[4] *Burger v. State*, 238 Ga. 171, 172 (231 SE2d 769) (1977). See 93 ALR5th 327, § 4.

a minister shortly before the night of the murder is not, standing alone, sufficient to render appellant's communications privileged.[5]

Moreover, nothing about appellant's communications with Reverend Boyd on the night of the murder indicates that appellant was professing his faith, or seeking spiritual comfort or guidance. Rather, insofar as appellant had decided to turn himself in to the police before he telephoned Reverend Boyd, he asked Boyd to accompany him to the police station and talk to the police on appellant's behalf. Thus, in contacting Reverend Boyd, appellant did not seek comfort or solace of a spiritual nature, but was rather seeking the help of a respected friend and source of secular strength to accompany him to the police station.

As expressly stated in OCGA § 24-9-22, only those communications with a clergy person in which the declarant is professing religious faith, or seeking spiritual comfort or counseling are deemed privileged. Accordingly, considering the totality of the circumstances involved in this matter, we conclude that appellant's statements to Reverend Boyd on the night of the murder were not privileged communications with a clergyman, and the trial court therefore properly denied appellant's motion in limine seeking to exclude his statements to Reverend Boyd.

3. The trial court properly admitted the hearsay testimony of witnesses Pryor and Carson under the necessity exception set forth in OCGA § 24-3-1 (b). As explained below, the circumstances attending the victim's hearsay statements evidenced particularized guarantees of trustworthiness that were legally sufficient substitutes for the oath and cross-examination of the declarant, the victim.[6] Pryor was the victim's manager at work, and she testified that the victim stated that appellant had once held a gun to her head and threatened to "blow her brains out." Pryor also testified that on the day of the murder, the victim said she had received a phone call from appellant, who told her he was going to kill her. Carson was the victim's coworker, and she testified that before the murder, the victim told her that appellant had threatened to harm her if she left him.

The record shows that the victim and Pryor were very close friends, and that the victim often confided in Pryor about her marital problems with appellant. The victim had worked with both Pryor and Carson for several years, and the three women had a close relationship. The evidence showed that the victim placed great trust and confidence in both Pryor and Carson, and she frequently turned to them for help and guidance with her problems. Over the years, the victim

[5] 93 ALR5th 327, § 2 (a).
[6] *Thomas v. State*, 274 Ga. 156, 162 (549 SE2d 359) (2001).

made several statements to Pryor and Carson concerning appellant's threats; there is nothing to indicate that these statements were either recanted or contradicted by the victim during her lifetime. Moreover, the hearsay statements concerning appellant's threats to kill the victim were consistent with the other evidence introduced at appellant's trial, which established that appellant did in fact murder the victim. Accordingly, we conclude that the hearsay statements were properly admitted under the necessity exception.[7]

4. The trial court did not err by letting witnesses Boyd and Carson read from their statements to police while testifying in appellant's trial.[8] In order for a witness to swear positively from paper, "it is essential that the witness should at some time have had personal knowledge of the correctness" of the paper, but "it is not necessary that the witness have present recollection of the contents."[9] In this matter, Boyd testified that he made his statement to police within days of the murder, and that the written statement accurately stated what he told the police at that time. For her part, Carson testified that when she gave her statement to police, the events were fresh in her mind and the document was a true and accurate representation of what she told the police at that time. Accordingly, contrary to appellant's argument, the State laid a proper foundation for the introduction of this evidence.

5. The trial court did not err by ruling that appellant could only introduce evidence that the murder victim had assaulted him in the past if appellant raised a claim of self-defense and gave prior notice to the State. At trial, appellant did not claim self-defense or justification. Appellant did, however, claim provocation by stating that the victim had told him that she would leave him and take his children away from him. That provocation, however, had nothing to with any alleged physical acts against appellant by the victim. If appellant wanted to introduce evidence of prior difficulties between himself and the victim, he was required to give the State ten days notice, establish the existence of the prior act, and make a prima facie showing of justification.[10] Because appellant neither followed these procedures nor made these showings, the trial court properly excluded any evidence that the victim had previously assaulted appellant.

*Judgment affirmed. All the Justices concur.*

---

[7] See *Thomas*, 274 Ga. at 163; *Ward v. State*, 271 Ga. 648, 650 (520 SE2d 205) (1999).

[8] See OCGA § 24-9-69.

[9] *Mincey v. State*, 257 Ga. 500, 505 (360 SE2d 578) (1987); Daniel, Georgia Handbook on Criminal Evidence, § 8-12, pp. 562-563. See *Bradshaw v. State*, 162 Ga. App. 750, 751 (293 SE2d 360) (1982).

[10] *Peterson v. State*, 274 Ga. 165, 167 (549 SE2d 387) (2001).

DECIDED OCTOBER 15, 2002.

*Charles H. Frier*, for appellant.

*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Marc A. Mallon, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Tammie J. Philbrick, Assistant Attorney General*, for appellee.